*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CITY OF DETROIT DOWNTOWN
DEVELOPMENT AUTHORITY and CITY OF
DETROIT,

        Plaintiffs/Counterdefendants-
        Appellees,

v

LOTUS INDUSTRIES LLC doing business as
CENTRE PARK BAR,

        Defendant/Counterplaintiff/Third-
        Party Plaintiff,

and

GWENDOLYN L. WILLIAMS, CHRISTOPHER
WILLIAMS, and KENNETH SCOTT
BRIDGEWATER,

        Defendants/Counterplaintiffs/Third-
        Party Plaintiffs-Appellants,

and

WAYNE CIRCUIT JUDGE,

        Third-Party Defendant,

and

ANDREW A. PATERSON,

        Appellant.

UNPUBLISHED
August 26, 2021

No. 350351
Wayne Circuit Court
LC No. 17-011066-CH

Before:  CAVANAGH, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Defendants/Counterplaintiffs/third-party plaintiffs, Gwendolyn L. Williams, Christopher Williams, and Kenneth Scott Bridgewater, and non-party appellant, attorney Andrew A. Paterson, appeal by right the trial court's order granting defendant Detroit Downtown Development Authority's (the DDA) motion for summary disposition of its claims against Gwendolyn and Bridgewater, and grant of summary disposition of their counterclaim and third-party complaint, and other orders decided adversely to defendants.  For the reasons stated in this opinion, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On August 19, 2013, defendant, Lotus Industries, LLC (Lotus), entered a five-year lease agreement (the Lease) with the City of Detroit Downtown Development Authority (the DDA) of a portion of a commercial property located at 1407 Randolph, in downtown Detroit, for use as a restaurant and bar with liquor sales not to exceed 40% of the gross sales generated on the premises. Lotus agreed to pay an annual base rent of $78,870 to be paid in monthly installments of $6,572.50, to increase annually according to a set formula in the Lease.  The Lease also required Lotus to pay monthly estimated additional rent consisting of its proportionate share of the building's common area maintenance and operating expenses, taxes, and insurance, which the DDA reconciled at the end of the year based upon such actual expenses incurred by the DDA.  The Lease prohibited Lotus from using the premises as a nightclub, dance hall, disco, or for any other use inconsistent with the specified designated use, and prohibited Lotus from permitting any person to use the premises in a manner inconsistent with applicable laws, ordinances, and regulations.  The Lease permitted the DDA on prior written notice to conduct a complete audit of Lotus's records to assess its gross sales and percentage of gross sales from the sale of alcoholic beverages.  Under the terms of the Lease, the DDA could terminate it and take possession of the premises upon the occurrence of any event of default including Lotus's nonpayment of rent, failure to perform its obligations, violation of applicable tenant rules and regulations, or filing of a bankruptcy petition.

In consideration of and to induce the DDA to enter the Lease with Lotus, Gwendolyn executed a personal guaranty on August 15, 2013, under which she unconditionally guaranteed the payment of all gross rent and charges under the lease, performance of all lease obligations, and payment of actual costs and attorney fees related to enforcement of the Lease.  Bridgewater executed an identical personal guaranty on the same date.

Lotus commenced doing business as the Centre Park Bar and Restaurant in April 2014. Around 2015, the DDA sought to redevelop areas of Detroit's downtown and requested development proposals.  Defendants submitted a proposal but the DDA rejected it as untimely. Defendants unsuccessfully attempted to resolve the matter and communicated with redevelopment officials and Detroit's mayor's office.  Defendants then publicly complained about the process and ultimately sued Detroit's mayor, the DDA, and others, in federal court alleging several claims. The DDA sought to assert counterclaims in that action but the federal court declined to exercise

-2-

supplemental jurisdiction over those claims.[1]  On July 24, 2017, therefore, plaintiffs brought this action against defendants alleging that Lotus d/b/a Centre Park Restaurant and Bar defaulted under the terms of the Lease by failing to pay the rent, by failing to produce documents and records in response to an audit request, by violating the defined use of the premises because more than 40% of its gross sales were from alcohol sales, by operating as a nightclub, by violating a local ordinance that prohibited making loud noise between 10:00 p.m. and 7:00 a.m. causing a nuisance, and because Lotus violated Detroit's outdoor café permit.  Plaintiffs alleged that Lotus's conduct triggered the DDA's right to terminate the lease.  Plaintiffs alleged counts for unpaid rent, breach of the Lease, breaches by Gwendolyn and Bridgewater of their respective personal guaranties, unjust enrichment, and sought a declaratory judgment that Lotus's option to extend the lease terminated automatically because of its numerous defaults of the Lease.  Further, plaintiffs asserted a claim for nuisance and abatement.

Plaintiffs sought a preliminary injunction on the ground that Lotus breached the Lease's use restriction by causing loud noise late at night that interfered with the Hilton Garden Inn Downtown Detroit's guests causing the hotel financial losses.  The hotel had filed a complaint with the city which the DDA investigated after learning about the complaint and it found evidence that defendants were having large parties with excessive noise.  Lotus's Centre Park Bar's Facebook page advertised itself as a nightclub featuring photo galleries of parties hosted at the bar with disc jockeys playing music outdoors which plaintiffs considered violations of the Lease's use prohibitions.  Plaintiffs argued that such activities constituted a nuisance requiring abatement and entry of a preliminary injunction.  The trial court ordered defendants to appear at a hearing to show cause.

Defendants filed what they characterized as a counterclaim against plaintiffs seeking the trial court's declaration that they were not in violation of the Lease and that they had fulfilled their Lease obligations.  Defendants also sued the presiding judge, Wayne Circuit Chief Judge Robert J. Colombo, Jr., alleging that the circuit court's assignment of plaintiffs' lawsuit to Judge Colombo pursuant to the local administrative order[2] governing civil case judicial assignments, violated their due-process rights by not randomly assigning the case to another judge, and they alleged that Judge Colombo held bias and prejudice for Detroit's mayor and the city, and against defense counsel, Andrew Paterson.

The day before the scheduled preliminary injunction hearing, defendants moved to disqualify Judge Colombo on the grounds that he held bias against defendants and Paterson for a number of reasons and that Judge Colombo had political ties to Detroit's mayor which they

---

[1] The federal court later dismissed defendants' lawsuit as a sanction for their failure to comply with the court's discovery orders despite previous warnings and less severe sanctions. *Williams v City of Detroit Downtown Development Authority*, unpublished opinion and order issued October 9, 2018, ED Mich Case No. 16-14112 (2018 WL 4901158).

[2] Local Administrative Order 2017-05 Subpart 1.e.*iv*, provided that, pursuant to MCR 8.111(B), all cases were assigned "by lot" except for certain cases, including nuisance abatement actions involving commercial property designated "CH" which were required to be assigned to the docket of the chief judge or a judge designated by the chief judge in a docket directive.

-3-

believed that Judge Colombo might not be able to remain impartial. Plaintiffs opposed defendants' motion. Judge Colombo considered but denied the motion after explaining that defendants' allegations for his disqualification were all false. Pursuant to MCR 2.003(D)(3)(a)(*ii*), the State Court Administrative Office assigned the de novo review of Judge Colombo's denial of the motion to Wayne County Chief Probate Judge Freddie G. Burton, Jr. Shortly thereafter defendants filed an emergency motion to disqualify Judge Burton in which they argued that Judge Burton lacked impartiality and held bias toward them. Judge Burton reviewed de novo defendants' motion for disqualification of Judge Colombo and issued an opinion denying the motion because defendants failed to demonstrate that Judge Colombo held actual personal prejudice against them or for another party, or that any appearance of bias existed that would disable the judge from properly conducting the proceedings.

Judge Burton also considered defendants' motion to disqualify himself. Judge Burton explained that the State Court Administrative Office appointed him to preside over the de novo review of the trial court's denial of defendants' motion to disqualify Judge Colombo pursuant to MCR 2.003(D)(3)(a)(*ii*). Judge Burton found defendants' motion procedurally defective because their supporting affidavit of Christopher failed to set forth any grounds for Judge Burton's disqualification as required under MCR 2.003(D)(1)(a) or MCR 2.119(B)(1), and merely recited alleged grounds for disqualification of Judge Columbo. Judge Burton further explained in detail how defendants' allegations that he harbored bias for Detroit's mayor and against Paterson were unfounded.

Judge Burton stated that defendants failed to overcome the presumption that a judge lacks bias because they presented no evidence that he had a pecuniary interest in the outcome, that he had been the target of abuse or criticism by the party before him, that he was enmeshed in matters involving defendants, or that he might have prejudice against them because of prior participation as an accuser, investigator, fact-finder, or initial decision-maker. Judge Burton concluded that defendants' disqualification motions indicated Paterson's intent to forum shop to find a judge who would never disagree or rule against defendants. Judge Burton also addressed plaintiffs' request for sanctions. Judge Burton stated that, based upon his conclusion that defendants' motion to disqualify him lacked factual and legal merit, sanctions against defendants were warranted and he permitted plaintiffs to submit a request for costs and fees which they did in the time allotted.[3]

---

[3] Defendants filed a complaint in the Court of Claims seeking a writ of mandamus and declaratory judgment requiring the State Court Administrative Office to assign another judge to review Judge Burton's denial of their motion to disqualify Judge Burton because it had denied their request for such further assignment. The State Court Administrative Office moved for summary disposition of defendants' complaint and the Court of Claims granted the motion because MCR 2.003 did not authorize or require the State Court Administrative Office to further assign the matter to another judge and because mandamus and declaratory judgment were not relief available to defendants where they could have and should have sought leave to appeal to this Court. On December 14, 2017, defendants filed a delayed emergency application for leave to appeal in this Court in which they sought to appeal the Court of Claims' ruling and to raise issues regarding whether Judge Burton had jurisdiction to consider and decide their motion to disqualify Judge Colombo. This

Just before the trial court held a two-day evidentiary hearing on plaintiffs' motion for preliminary injunction, defendants moved to adjourn the hearing and Paterson moved to withdraw as defendants' counsel because defendants and Paterson needed more time to prepare. The trial court opined that Paterson inappropriately engaged in efforts to stop the show cause hearing from happening. The trial court stated that the case involved determination whether defendants operated a bar that caused a nuisance that interfered with the rights of others. The trial court, therefore, denied defendants' motion for an adjournment. The trial court also denied Paterson's motion to withdraw because the motion represented another effort by Paterson to delay the proceedings. The trial court next conducted the show cause hearing and based upon the evidence presented regarding the terms of the Lease and Lotus's breaches by the Centre Park Bar's hosting of loud parties that violated Detroit's noise ordinance, the trial court ordered defendants to immediately abate the nuisance and enjoined them from any further city ordinance violations and use of the premises to provide entertainment by a DJ or live music outdoors.

Plaintiffs moved for sanctions against defendants and Paterson for filing a frivolous disqualification motion and frivolous third-party claim against Judge Colombo. Plaintiffs sought sanctions under MCR 2.114.[4] Plaintiffs also asserted that defendants filed a frivolous claim against the judge in their third-party complaint in violation of MCL 600.2591.[5] Defendants opposed the motion. The trial court found that defendants and Paterson violated MCR 2.114 by filing their meritless motion to disqualify Judge Colombo, and therefore, granted plaintiffs' motion and sanctioned defendants and Paterson. Plaintiffs next moved for entry of a judgment regarding the sanctions imposed under MCR 2.114. Defendants and Paterson opposed the motion and the trial court held a hearing at which it considered plaintiffs' respective counsels' evidence and determined that plaintiffs' respective counsels' rates and the work performed in relation to defendants' and Paterson's motion to disqualify Judge Colombo were reasonable. The trial court entered a judgment against defendants and Paterson holding them jointly and severally liable for plaintiffs' respective attorneys' fees and costs.

On January 18, 2018, Lotus filed a petition for protection under Chapter 11 of the United States Bankruptcy Code and filed notice in the circuit court that an automatic stay under 11 USC

---

Court denied defendants' emergency application for leave to appeal and also ordered Paterson to pay this Court $500 as an appropriate sanction for his signing and filing a motion for immediate consideration without first making a reasonable inquiry and for an improper purpose. *Detroit Downtown Development Authority v Lotus Industries*, unpublished order of the Court of Appeals entered December 21, 2017 (Docket No. 341520).

[4] MCR 2.114, which specified the requirement of a signature on documents filed with the court and set forth the effect of signing such documents and provided for sanctions for violation of the rule and for filing a frivolous claim or defense, was repealed effective September 1, 2018. Currently, the provisions regarding signing of documents filed with the court, the effect of a signature on same, and the availability of sanctions for violation of the rule and for filing frivolous claims and defenses is contained in MCR 1.109 which became effective July 1, 2021.

[5] The trial court had previously severed the third-party complaint and it had been reassigned to another circuit judge, so the trial court declined to consider matters pertaining to it.

§ 362 applied in this case. Later in the Lotus bankruptcy proceeding, the DDA moved to convert the case to a Chapter 7 liquidation bankruptcy and the bankruptcy court granted the motion. The DDA notified the trial court that the bankruptcy court found that Lotus mismanaged the bankruptcy estate, failed to appear for the scheduled debtor's examination, likely could not propose a confirmable reorganization plan, and filed the Chapter 11 case in bad faith. The bankruptcy court appointed a Chapter 7 Trustee over Lotus's bankruptcy estate with authority to control Lotus's business and affairs including the administration of the Lease. Consequently, Paterson lacked any further authority over matters pertaining to representation of Lotus in any legal proceeding. See *In re Lotus Industries LLC*, unpublished Order Granting Creditor's Motion to Convert, entered March 22, 2018, Case No. 18-40621 (Bankr ED Mich), *In re Lotus Industries LLC*, unpublished Stipulated Order on Motion to Dismiss, entered March 27, 2018, Case No. 18-40621 (Bankr ED Mich) (denying Lotus's motion to dismiss Chapter 7 case).

The DDA moved for partial summary disposition of its claims against Gwendolyn and Bridgewater for breaches of their respective personal guaranties because of their failure to pay the DDA the gross rent owed by Lotus about which Christopher had admitted in response to requests for admission and in his deposition testimony. Defendants' opposed the DDA's motion on the grounds that the motion was premature because discovery had not been completed, a dispute existed regarding the amount of rent owed by Lotus, the trial court could not determine the amount Lotus owed because of the bankruptcy automatic stay, and the trial court could not determine how much Gwendolyn and Bridgewater owed for breaches of their respective personal guaranties because doing so would also violate the automatic stay. Defendants also argued that the personal guaranties were rendered void by an agreement with the DDA that they would be lifted if Lotus turned a profit by the end of its third year of operation. The DDA replied to defendants' response by asserting that no law precluded the trial court from determining the amount of rent owed by Lotus which would not constitute any violation of the automatic stay. The DDA explained that Lotus sought the application of the stay to Gwendolyn and Bridgewater but the bankruptcy court denied the motion because the summary disposition motion pending in the trial court was entirely separate from the bankruptcy proceedings and would have no impact on Lotus's bankruptcy estate. The DDA also denied that it ever terminated the personal guaranties and explained that, at the time defendants claimed Lotus showed a profit, it actually had been in default and owed $22,032.30 in rent.

The trial court considered the DDA's motion for partial summary disposition at a hearing held on May 14, 2018. It dispensed with oral arguments by the parties and issued its opinion from the bench. The trial court summarized the DDA's damages calculation in relation to the breaches of the guaranties by Gwendolyn and Bridgewater based upon the account Lease Ledger. The trial court noted that the DDA's Demand for Possession Non-Payment of Rent showed that as of March 7, 2018, the amount owed equaled $171,973.11, an amount supported by the affidavit of Scott Harrison, the property manager associated with the Farbman Group which managed the subject property for the DDA. The trial court also considered Christopher's admissions for its determination of the amount of damages. The trial court found that the personal guaranties made Gwendolyn and Bridgewater liable for all gross rent without setoff. Therefore, the trial court granted the DDA partial summary disposition.

Plaintiffs also moved for entry of a judgment based upon the sanctions imposed by Judge Burton upon defendants and Paterson related to their filing of a frivolous motion to disqualify

Judge Burton. Plaintiffs submitted their respective counsels' affidavits and itemized bills of costs and fees. Defendants opposed plaintiffs' motion related to Judge Burton's sanctions order by arguing that the Chief Judge of the Wayne County Probate Court lacked jurisdiction to enter any orders or decide any motions in a civil action pending in the county circuit court. Defendants and Paterson also contested the reasonableness of the attorneys' fees sought by plaintiffs. Judge Burton conducted a hearing to determine the amount of sanctions related to the court's decision granting sanctions to plaintiffs. Judge Burton permitted Paterson to examine plaintiffs' respective counsel regarding the work performed for their clients and the amount of time expended doing so. Judge Burton issued his opinion and entered a corresponding judgment about six week later. Judge Burton found plaintiffs' respective attorneys' rates and the number of hours expended to perform the work reasonable, except that Judge Burton reduced one of the DDA attorney's rate to $300 per hour and found that the DDA did not need two attorneys in attendance at the sanction motion hearing, so he reduced the DDA's requested hours by 2.5 hours. Judge Burton entered a judgment against defendants and Paterson holding them jointly and severally liable for plaintiffs' respective costs and attorneys' fees as set forth in his opinion, but later entered an amended judgment, jointly and severally against defendants and Paterson, in favor of the DDA in the amount of $1,372, and in favor of Detroit in the amount of $3,442.65.[6]

Before the scheduled bench trial, the DDA moved in limine to limit or clarify the scope of the trial because it contended that the sole issue remaining for trial concerned whether Gwendolyn and Bridgewater owed additional rent but it anticipated that defendants would attempt to collaterally attack the trial court's summary disposition ruling. Defendants did not respond to the DDA's motion in limine and failed to attend the hearing. The trial court granted the DDA's motion.

The trial court held a two-day bench trial limited to the amount of gross rent owed by Gwendolyn and Bridgewater under the terms of their personal guaranties. The parties stipulated to the admission of the Lease, the personal guaranties, the Lease Ledger and additional rent reconciliation sheets for Lotus's account, and the notices of default. Harrison testified in detail regarding the subject property's management for the life of the Lease including Lotus's rent payment history and defaults. He also testified regarding the additional rent estimated charges and year-end reconciliations that resulted in Lotus's being charged or credited depending upon the reconciliation of the account. He also testified regarding the gross amount of rent remaining due as shown in the Lease Ledger and reconciliation sheets.

Christopher testified and admitted that the Lease had been contingent upon the execution of personal guaranties by Gwendolyn and Bridgewater. He admitted that the Lease required the payment of base rent and additional rent and that payment of the rent had to be made regardless of any claims against the DDA or any claimed right to setoffs. Christopher admitted that he

---

[6] Gwendolyn, Bridgewater, Christopher, and Paterson sought leave to appeal Judge Burton's August 3, 2018 amended judgment. This Court denied them leave to appeal because they failed to persuade the Court of the need for immediate appellate review. *Downtown Development Authority v Lotus Industries*, unpublished order of the Court of Appeals entered January 22, 2019 (Docket No. 345183).

previously admitted that Lotus breached the Lease and also admitted that he withheld payment of the gross rent and instead paid it into escrow accounts starting in December 2016. He admitted that he previously admitted that doing so violated the Lease. On cross-examination by Paterson, he asserted that the DDA's additional rent charges were arbitrary and had not been supported by explanation or documentation to his satisfaction. Christopher testified that in his opinion the Lease Ledger and reconciliations lacked accuracy, the DDA owed Lotus for all the additional rent it paid, and Lotus owed nothing to the DDA.

At the conclusion of the bench trial, the trial court made findings of fact and conclusions of law. Relevant to this appeal, the trial court found that Gwendolyn and Bridgewater executed personal guaranties which provided that they did so to induce the DDA to enter into the Lease. The trial court ruled that Gwendolyn and Bridgewater absolutely and unconditionally guaranteed "[p]ayment of all gross rent and all charged charges and amounts due and owing under the lease" and they agreed that the obligations were not "subject to any offset, deduction, deferment, or abatement, of any kind." The trial court recalled that it granted the DDA partial summary disposition on May 16, 2018, in the amount of $102,562.92, and found that the Lease Ledger indicated that Lotus owed the balance of $72,481.17. The trial court found that the DDA improperly charged Lotus $189.33 for a late fee on February 24, 2015, which required a deduction of that amount from the DDA's claim. The trial court, therefore, ruled that the DDA had entitlement to entry of judgment against both of the guarantors in the amount of $72,291.84. The trial court later entered judgment on its verdict holding Gwendolyn and Bridgewater jointly and severally liable in the amount of $72,291.84 on Counts III and IV of the DDA's complaint.

On December 20, 2018, defendants filed a claim of appeal from the trial court's November 30, 2018 order. This Court dismissed their claim of appeal without prejudice for lack of jurisdiction because the trial court had not disposed of defendants' counterclaim and third-party claim. *Downtown Development Authority v Lotus Industries*, unpublished order of the Court of Appeals entered February 1, 2019 (Docket No. 346916). This Court's dismissal of defendants' claim of appeal prompted the DDA to move for summary disposition of defendants' counterclaim and third-party complaint. The DDA argued that the trial court should grant summary disposition including but not limited to that the equitable relief defendants sought in their purported counterclaim had been resolved via summary disposition and the bench trial, and to remove doubt about the dismissal of the third-party claim, summary disposition would appropriately dispose of the matter because Judge Colombo enjoyed absolute judicial immunity from such claim.

Defendants opposed the motion on the ground that they were entitled to adjudication of their counterclaim because Gwendolyn and Bridgewater had the right to argue and present proofs that they did not violate the Lease, and that the trial court's judgments had only determined the amount of rent owed by Lotus but did not adjudicate whether the individual defendants violated the Lease. Defendants argued that their third-party claim against Judge Colombo required adjudication because he lacked immunity under MCL 691.1407(5) since their third-party complaint did not assert a tort claim against him and judges lacked immunity for non-tort claims. Further, they asserted that their third-party complaint sought a declaration that the local administrative order violated their due-process rights. Defendants contended that genuine issues of material fact existed precluding summary disposition of their counterclaim and third-party complaint.

The trial court, Judge Timothy M. Kenny, presiding following Judge Colombo's retirement, heard the DDA's motion on August 2, 2019. At the hearing's conclusion, the trial court issued its ruling and stated that the court file established that Judge Colombo had determined that Lotus violated the terms and conditions of the Lease which justified its verdict against Gwendolyn and Bridgewater. Further, the trial court determined that during the course of the case, Judge Colombo granted summary disposition after finding that defendants made admissions that they owed a substantial amount of rent which constituted a breach of the Lease. Concerning plaintiffs' argument that defendants waived their counterclaim, the trial court stated that it reviewed Judge Colombo's order regarding plaintiffs' motion in limine. The trial court observed that defendants failed to respond to the motion and failed to appear at the hearing on that motion. Further, they never moved for reconsideration of the court's ruling. The trial court noted that Judge Colombo had ruled that, as a matter of law, Lotus had breached the Lease conditions and that the bench trial would be limited in scope to determining if defendants owed additional damages. Based upon the record, the trial court ruled that defendants waived their counterclaim.

The trial court also considered whether defendants had failed to state a cause of action in their counterclaim. It stated that it had to look at the substance of the allegations to make that determination. The trial court ruled that the counterclaim in this case served merely as a denial of plaintiffs' allegations in their compliant and defendants asked the trial court to declare that they did not breach the Lease. The trial court opined that the counterclaim did not really state an actual counterclaim and concluded that, at the point in the proceedings, a claim that there had not been a breach of the Lease flew in the face of the trial court's previous summary disposition ruling and the court's findings supporting the trial verdict.

Respecting the third-party complaint, the trial court ruled that Michigan law provided Judge Colombo absolute immunity and the third-party claim lacked merit because our Supreme Court's Administrative Order MCR 8.110 and MCR 8.111 gave the chief judge authority and responsibility for administering the court's business. The trial court, therefore, granted plaintiffs' motion for summary disposition of defendants' counterclaim and third-party complaint. The trial court entered a final order granting the DDA's motion for summary disposition of defendants' counterclaim and third-party complaint. This appeal followed.

ANALYSIS

Defendants argue that the trial court erred by entering summary disposition against Gwendolyn and Bridgewater under their personal guaranties without permitting them to present evidence entitling them to setoffs and adjustments to the gross rent. They contend that genuine issues of material fact existed regarding the amount of rent owed by Lotus and the validity of the personal guaranties. They also assert that the trial court prematurely granted the DDA's motion because defendants lacked opportunity to conduct discovery respecting the DDA's claims against Gwendolyn and Bridgewater and the intent and meaning of the personal guaranties. We find no merit to these claims of error.

We review de novo a trial court's summary disposition decision. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). We also review de novo a trial court's contract interpretation. *Sands Appliance Serv, Inc v Wilson*, 463 Mich 231, 238; 615 NW2d 241 (2000).

We review de novo issues of law and the interpretation and application of court rules. *Henry v Dow Chem Co*, 484 Mich 483, 495; 772 NW2d 301 (2009).

A motion brought under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim, and is reviewed by considering the pleadings, admissions, and other evidence submitted by the parties in a light most favorable to the nonmoving party. *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). Summary disposition is proper if there is "no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. A genuine issue of material fact exists when "reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008) (citation omitted). We consider only the evidence that was properly presented to the trial court in deciding the motion. *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 310; 660 NW2d 351 (2003).

Summary disposition may be premature if granted before discovery is complete on a disputed issue. *Village of Dimondale v Grable*, 240 Mich App 553, 566; 618 NW2d 23 (2000). "However, summary disposition may be proper before discovery is complete where further discovery does not stand a fair chance of uncovering factual support for the position of the party opposing the motion." *Id*. (quotation marks and citation omitted).

The resolution of this case involves the interpretation of the terms of the parties' contracts, the Lease, and Gwendolyn's and Bridgewater's personal guaranties. Guaranty contracts are to be construed like other contracts. *First Nat Bank of Ypsilanti v Redford Chevrolet Co*, 270 Mich 116, 121; 258 NW 221 (1935). A personal guaranty, however, "is a special kind of contract" which trial courts must strictly interpret. *Bandit Industries, Inc, v Hobbs Int'l, Inc (After Remand)*, 463 Mich 504, 511; 620 NW2d 531 (2001). A personal guarantor is liable under the express terms of the guaranty contract, but no further. *Id*. at 513.

"The primary goal in interpreting contracts is to determine and enforce the parties' intent." *Old Kent Bank v Sobczak*, 243 Mich App 57, 63; 620 NW2d 663 (2000). "To do so, this Court reads the agreement as a whole and attempts to apply the plain language of the contract itself." *Id*. (citations omitted). The language of the contract is to be given its ordinary, plain meaning; technical, constrained constructions should be avoided. *Bianchi v Automobile Club of Mich*, 437 Mich 65, 71 n 1; 467 NW2d 17 (1991). The construction of the terms of a contract is generally a question of law for the court; however, where a contract's meaning is ambiguous, the question of interpretation should be submitted to the fact-finder. *D'Avanzo v Wise & Marsac, PC*, 223 Mich App 314, 319; 565 NW2d 915 (1997). A contract is ambiguous when its words can reasonably be understood in different ways. *Id*. Inartfully worded or clumsily arranged contract terms do not render a contract ambiguous if it fairly admits of one interpretation. *Mich Twp Participating Plan v Pavolich*, 232 Mich App 378, 382; 591 NW2d 325 (1998). If the contract language is clear and unambiguous, the trial court is bound by the specific language of the agreement. *Id*.

"As a general rule, where terms having a definite legal meaning are used in a written contract, the parties to the contract are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument." *Conagra, Inc, v Farmers State Bank*, 237 Mich App 109, 132; 602 NW2d 390 (1999) (quotation marks and citations omitted). Trial courts may not substitute their own judgment for the intent of the parties and

remake the contract into something the parties never intended because that would undermine the parties' freedom to contract. *Grosse Pointe Park v Mich Muni Liability & Prop Pool*, 473 Mich 188, 199-200; 702 NW2d 106 (2005). Parties are free to contract as they see fit, and trial courts must enforce contracts unless they are in violation of law or public policy. *Wilkie v Auto-Owners*, 469 Mich 41, 51; 664 NW2d 776 (2003).

Contracts must "be construed as a whole, giving effect to all provisions." *Turner v Bituminous Cas Co*, 397 Mich 406; 244 NW2d 873 (1976). Courts must avoid interpretations " 'that would render any part of the contract surplusage or nugatory,' " and must also, if possible, seek an interpretation that harmonizes potentially conflicting terms. *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership*, 295 Mich App 99, 111; 812 NW2d 799 (2011), remanded on other ground but otherwise lv den, 493 Mich 859 (2012), quoting *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468-469; 663 NW2d 447 (2003). Further, where a contract contains specific and general terms, the specific terms control over the general terms. *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 719; 706 NW2d 426 (2005).

In this case, the Lease provided specific terms that defined the designated use of the premises in § 1.15, with more definitive specification of the limitations on the use of the premises in Part 7. The Lease specified the annual base rent plus additional rent in § 4.1 to be paid in monthly installments as set forth in § 4.2. Of particular importance in this case, the Lease § 4.2 specified unequivocally that the tenant must pay all rent to the landlord in advance, "without any abatement, setoffs or deductions, on the first day of each and every calendar month . . . ."

Part 6 defined in detail the additional rent which consisted of the tenant's estimated annual proportionate share of the building's annual common area maintenance and operating expenses, taxes, and insurance, to be paid monthly, and then adjusted at the end of the year. Section 6.4 provided for explanation of the additional rent as follows:

> At the time of any adjustment, Landlord shall furnish to Tenant evidence of the increase in Operating Expenses and Landlord's Insurance reasonably sufficient to sustain the adjustment. If Tenant is not satisfied with Landlord's determination of the amount of such Additional Rent, Tenant shall pay the Additional Rent, but Tenant shall have the right to require Landlord to furnish to Tenant a detailed statement of the basis for such increase. As soon as reasonable after the expiration of each calendar year, Landlord will furnish the Tenant a statement showing actual Operating Expenses, Landlord's Insurance and Real Estate Taxes for the expired calendar year.

Part 17 of the Lease defined the events of default, including nonpayment of rent, which gave the landlord the right to terminate the Lease and take possession of the premises. Section 17.10 provided:

> Notwithstanding anything to the contrary, Tenant acknowledges and agrees that its obligation to pay Rent under this Lease is an independent covenant, and that such obligation to pay is not subject to setoff or recoupment in connection with any action for summary proceedings to recover possession of the Premises.

The Lease's terms are clear and unambiguous. The Lease provided no right to Lotus to withhold any payment of the base rent or additional rent for any reason. No provision of the Lease permitted Lotus to pay base rent or additional rent into any escrow account. The Lease also unambiguously required Lotus to pay the base rent and additional rent without any right to setoffs, deductions, or recoupment. Lotus remained obligated to make its monthly payments of the base rent and additional rent regardless of any disputes or questions it had regarding the amount or the underlying costs the DDA incurred which served as the bases for the additional rent charges.

Gwendolyn's and Bridgewater's personal guaranties also lack ambiguity. Their respective personal guaranties provided that they each executed the guaranty to induce the landlord to enter into the Lease. Under the terms of their guaranties, Gwendolyn and Bridgewater each assented to all of the provisions of the Lease. Their personal guaranties further unequivocally stated that they each:

> absolutely and unconditionally guarantee[d], as principal and not as indemnitors, to Landlord: (a) payment of all of the Gross Rent, and all other charges and amounts due and owing under the Lease; and (b) performance of all obligations, covenants, and agreements set forth in the Lease, and all actual costs of enforcing this Guaranty, including reasonable attorneys fees. The liability hereunder of the undersigned to Landlord shall be direct and absolute, and shall not be conditioned upon the pursuit by Landlord of whatsoever remedies that may at any time be available to Landlord against Tenant.

Gwendolyn and Bridgewater, among other things, each further agreed in relevant part:

> that the obligations of the undersigned to the Landlord hereunder shall be primary and unconditional and shall neither . . . be subject to any setoff, deduction, deferment, or abatement, of any kind or nature . . . .

> \* \* \*

> Nothing shall constitute a waiver of or bar to or in any way impair Landlord's right to insist upon strict performance of the terms of this Guaranty, except only a written agreement to such effect hereafter duly authorized, executed, and delivered by Landlord to the undersigned.

Gwendolyn and Bridgewater each accepted the terms of the Lease and absolutely and unconditionally guaranteed payment of all base rent and additional rent owed by Lotus. They also specifically agreed that they would have no right to setoffs, deductions, deferments, or abatements of any kind. The record does not indicate any amendment or change of any kind to the terms of Gwendolyn's and Bridgewater's personal guaranties. Therefore, under the terms of the Lease and the personal guaranties, Gwendolyn and Bridgewater were contractually bound to pay all of the base rent and additional rent owed by Lotus with no right to any setoffs. The terms of the Lease to which they assented coupled with the terms of their personal guaranties required Gwendolyn and Bridgewater to pay the unpaid gross rent with no right to any setoffs or adjustments even if they disputed the amount or claimed the DDA breached the Lease.

The record reflects that the trial court considered the evidence presented by the DDA in relation to its motion for partial summary disposition of its claims against Gwendolyn and Bridgewater for breaches of their respective personal guaranties. The trial court considered defendants' arguments in opposition to that motion. The trial court considered defendants' assertion that the personal guaranties were no longer valid because of an e-mail exchange between Christopher and Mark Denson regarding the removal of the personal guaranties if Lotus became profitable. The trial court found that argument lacked merit because the DDA presented rebuttal evidence that established that the e-mail exchange took place before the execution of the personal guaranties, and therefore, constituted inadmissible parol evidence. The trial court explained further that defendants' argument that the guaranties were void lacked merit because the guaranties gave the DDA absolute discretion to terminate them, but no evidence of such termination after the execution of the personal guaranties existed. The record reflects that the DDA presented evidence that it never terminated the personal guaranties and that, at the time that defendants claimed Lotus showed a profit, it actually had been in default and owed $22,032.30 in unpaid rent, an amount that far exceeded the claimed profit. Lotus, therefore, had not in fact achieved profitability to warrant consideration by the DDA to terminate the personal guaranties. The trial court did not err by ruling that Gwendolyn's and Bridgewater's personal guaranties were enforceable contracts.

The record also reflects that, in ruling on the DDA's motion for partial summary disposition, the trial court reflected upon Christopher's answer to plaintiffs' request to admit regarding the amount that Lotus owed the DDA for rent without any setoffs. The trial court also considered Christopher's deposition testimony in which he admitted that Lotus owed rent. The trial court properly found Christopher's admissions conclusively binding upon defendants. The trial court also correctly refused to permit Christopher to submit an affidavit that contradicted his earlier sworn testimony.

The record indicates that the trial court analyzed the DDA's damages calculation in relation to the breaches of the guaranties by Gwendolyn and Bridgewater. The trial court based its summary disposition ruling on Christopher's admissions and the Lease Ledger and reconciliation sheets which reflected the account charges for base rent and additional rent and reported defendants' payments and failed attempts at payment with insufficient funds checks. The trial court noted that the DDA's Demand for Possession Non-Payment of Rent showed that as of March 7, 2018, the amount owed equaled $171,973.11, an amount supported by the unrebutted affidavit of Harrison. The trial court correctly found that the personal guaranties made Gwendolyn and Bridgewater absolutely liable for all gross rent owed by Lotus without setoffs. The trial court, therefore, properly granted the DDA summary disposition of its claims against Gwendolyn and Bridgewater.

The record reflects that the trial court correctly interpreted the terms of the Lease and the terms of Gwendolyn's and Bridgewater's personal guaranties. The trial court properly concluded that Gwendolyn and Bridgewater could neither rely on setoffs as a defense to Lotus's liability for unpaid gross rent nor evade liability by claiming that they were not liable under the terms of their respective personal guaranties. Accordingly, the trial court did not err by holding them liable for breach of their respective guaranties for not paying the gross rent due and owing by Lotus.

Defendants also argued to the trial court that partial summary disposition would be premature because they needed discovery to determine how much rent Lotus owed. The trial court

-13-

did not expressly address that argument but appropriately refused to give it any credence. The record reflects that plaintiffs filed this action on July 24, 2017. On August 29, 2017, the trial court entered a scheduling order that set the discovery cutoff as November 28, 2017. Defendants, therefore, had four months in which to conduct discovery. The record also reflects that this case went on for almost another year before the trial court conducted the October 22 and 23, 2018 bench trial at which the parties presented evidence respecting the remaining gross rent owed by Gwendolyn and Bridgewater as Lotus's personal guarantors. During the pendency of this case, defendants never conducted discovery and never moved for an extension of the discovery period. They merely made the empty assertion to the trial court that they needed more discovery.

Irrespective of whether they needed additional discovery, their setoff contentions were futile and meritless because both the terms of the Lease and the terms of the personal guaranties prohibited any setoffs, deductions, adjustments, abatements, or other reductions of the gross rent, and required full payment of the gross rent. Moreover, defendants could not refuse to pay the gross rent and deposit it into escrow accounts. Defendants doing so violated the Lease. Gwendolyn's and Bridgewater's failure and refusal to pay the unpaid gross rents violated their respective personal guaranties. Accordingly, as a matter of law, defendants had no entitlement to setoffs or adjustments as a defense to the DDA's claims against Gwendolyn and Bridgewater for their respective breaches of their personal guaranties. Therefore, the trial court did not err by granting the DDA summary disposition of its claims against Gwendolyn and Bridgewater under MCR 2.116(C)(10) because no genuine issue of material fact existed regarding the terms of the Lease, the terms of the personal guaranties, Lotus's breach of the Lease, and their respective obligations under their personal guaranties to pay all rents due and unpaid by Lotus without any right of setoff. Further, no dispute existed that Gwendolyn and Bridgewater failed to honor the terms of their personal guaranties.

Defendants also argue that the trial court erred by granting plaintiffs summary disposition and dismissing their counterclaim against plaintiffs and their third-party claim against Judge Colombo. We disagree.

Defendants assert that their counterclaim against plaintiffs sought a declaratory judgment. MCR 2.605 governs actions for declaratory judgments. MCR 2.605(A)(1) states: "In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." This Court has explained that an "actual controversy" exists where declaratory relief is needed to guide a plaintiff's future conduct in order to preserve the plaintiff's legal rights. *Citizens for Common Sense in Gov't v Attorney General*, 243 Mich App 43, 55; 620 NW2d 546 (2000). The plaintiff must plead and prove an adverse interest "necessitating the sharpening of the issues raised." *Shavers v Attorney General*, 402 Mich 554, 589; 267 NW2d 72 (1978). The purpose of the declaratory judgment rule is:

> to enable parties, in appropriate circumstances of actual controversy, to obtain an adjudication of their rights before actual injury occurs, to settle matters before they ripen into violations of law or a breach of contractual duty, to avoid multiplicity of actions by affording a remedy for declaring in one expedient action the rights and obligation of all litigants, or to avoid the strictures associated with obtaining coercive relief, when coercive relief is neither desired nor necessary to resolve the

matter. [*Skiera v Nat'l Indemnity Co*, 165 Mich App 184, 189; 418 NW2d 424 (1987)]

Close analysis of defendants' counterclaim reveals that defendants did not allege a claim against plaintiffs for which plaintiffs bore liability of any sort to any of the defendants. Defendants did not allege the existence of an actual controversy as to the parties' respective legal rights under the Lease, and they did not seek a declaration by the trial court as to what rights the parties had under the Lease to settle matters before they ripened into breach of contractual duties. Instead, after Lotus breached the Lease and the DDA sought to enforce the Lease and the personal guaranties by filing this lawsuit, defendants filed their counterclaim alleging that the trial court should declare that they did not violate the Lease and that they fulfilled their Lease obligations. Defendants' counterclaim plainly sought the trial court's approval of their denial of liability for the alleged breaches of the Lease. Defendants' counterclaim, therefore, did not constitute a claim for declaratory judgment. Neither did it assert an actual cognizable counterclaim against plaintiffs.

The record reflects that the trial court carefully analyzed defendants' counterclaim and found that it stated a denial of plaintiffs' allegations and not an actual claim for declaratory relief. Although the trial court likely could have dismissed the counterclaim on that ground alone, it further considered the substance of their denial of liability. The trial court examined the record and properly found that the trial court's previous grant of partial summary disposition to the DDA and the trial court's verdict following the bench trial effectively determined that Lotus had breached the Lease. The trial court concluded that the evidence in the record established Lotus's breaches of the Lease which unequivocally rendered defendants' denial of any breach of the Lease unsustainable.

The record indicates that the trial court also considered defendants' assertion that issues of fact abounded precluding summary disposition on their counterclaim and that they were entitled to their day in court so that they could establish setoffs and adjustments to the amount of gross rent for which the trial court found Gwendolyn and Bridgewater liable to the DDA. The trial court correctly found no merit to defendants' contentions. The record evidence established that defendants admitted that Lotus committed breaches of the Lease by not paying the rent when due. Lotus's breaches triggered Gwendolyn's and Bridgewater's payment obligations under their personal guaranties. The terms of the Lease and the terms of the personal guaranties prohibited setoffs or adjustments and required payment of the gross rents. Defendants' counterclaim, therefore, lacked factual and legal support, and failed as a matter of law. Further, no genuine issue of material fact precluded granting summary disposition and dismissal of defendants' counterclaim.

The trial court also ruled that defendants waived any right to raise the issues or present evidence to support their claim to setoffs by failing to respond to the DDA's motion in limine or attend the hearing on that motion which resulted in the limitation of the issues the trial court considered at the bench trial. A waiver is the intentional relinquishment or abandonment of a known right. *Patel v Patel*, 324 Mich App 631, 634; 922 NW2d 647 (2018). A valid waiver may be shown by an express declaration that manifests a party's intent and purpose, "or be an implied waiver, evidenced by a party's decisive, unequivocal conduct reasonably inferring the intent to waive." *Id*. (quotation marks and citations omitted). In this case, the record supports the trial court's conclusion that defendants waived the right to raise any issues regarding setoff. Defendants

-15-

did not respond to the DDA's motion and did not attend the hearing on that motion. Further, as the trial court correctly observed at the hearing on the DDA's motion to dismiss the counterclaim, the record reflects that, after the trial court ruled on the DDA's motion in limine, defendants did not seek reconsideration or move for permission to present evidence or witnesses to establish their position. Moreover, at the hearing on plaintiffs' motion to dismiss defendants' counterclaim, when asked by the trial court why defendants failed to respond or attend, Paterson had no response and could not reasonably justify defendants' inaction. Accordingly, the trial court did not err in concluding that defendants knowingly waived any alleged right to present evidence of setoffs. The trial court, therefore, did not err by dismissing defendants' counterclaim.

Defendants next argue that the trial court erred by dismissing their third-party complaint against Judge Colombo. We disagree.

In *Diehl v Danuloff*, 242 Mich App 120, 128-129; 618 NW2d 83 (2000), this Court explained:

> It is well settled that judges are accorded absolute immunity from liability for acts performed in the exercise of their judicial functions. See *Forrester v White*, 484 US 219, 225; 108 S Ct 538; 98 L Ed 2d 555 (1988). The United States Supreme Court has noted that absolute immunity serves the dual purposes of protecting the finality of judgments and preserving the judicial independence by "insulating judges from vexatious actions prosecuted by disgruntled litigants." *Id*. The Court has further noted that the broad scope of the immunity is not intended to protect the malicious or corrupt wrongdoer, but instead is " 'for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.' " *Pierson v Ray*, 386 US 547, 554; 87 S Ct 1213; 18 L Ed 2d 288 (1967) (citations omitted).

More recently, in *Serven v Health Quest Chiropractic, Inc*, 319 Mich App 245, 253-254; 900 NW2d 671 (2017), after this Court described the absolute judicial immunity doctrine, it further explained:

> Accordingly, judges "are not liable to civil actions for their judicial acts even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Bradley v Fisher*, 80 US (13 Wall) 335, 351; 20 L Ed 646 (1871). Absolute immunity is necessary because "controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree" and could cascade into a never-ending river of actions in other forums. *Butz v Economou*, 438 US 478, 512; 98 S Ct 2894; 57 L Ed 2d 895 (1978). And "safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Id*. For example,
>
> > [t]he insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the

knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error. [*Id*.]

In this case, defendants sued Judge Colombo in his capacity as a sitting judge for approving and applying the local administrative order which required assignment of real property and nuisance cases to him as the chief judge of the circuit court. Defendants alleged that Judge Colombo held bias against them and for Detroit, and that the local administrative order, as applied to them, violated their due-process rights. Under longstanding Michigan law, as articulated in *Diehl* and *Serven*, Judge Colombo enjoyed the protections of absolute judicial immunity which barred defendants' suit against him. Under *Diehl and Serven*, even if Judge Colombo violated due process by adopting and applying the contested local administrative order, he still could not be sued.

The trial court correctly determined that Judge Colombo had absolute judicial immunity. The trial court also correctly found that in MCR 8.110, MCR 8.111, and MCR 8.112, our Supreme Court vested chief judges, like Judge Colombo, with the authority and responsibility for directing, supervising, and administering the court's business, including but not limited to, the assignment of all cases and the adoption of local court rules and administrative orders. The trial court noted that the contested local administrative order had been in place for decades and Judge Colombo's application of the order to this case when filed constituted an act performed in the exercise of Judge Colombo's judicial functions. The trial court, therefore, properly determined that Judge Colombo had absolute judicial immunity and correctly dismissed defendants' third-party claim against him.

Defendants' argument that the law-of-the-case doctrine applied and somehow prohibited the trial court from dismissing their counterclaim and third-party complaint also lacks merit. In *Brownlow v McCall Enterprises, Inc*, 315 Mich App 103, 110-111; 888 NW2d 295 (2016) (quotation marks and citations omitted), this Court explained:

The law of the case doctrine provides that a ruling by an appellate court with regard to a particular issue binds the appellate court and all lower tribunals with respect to that issue, but only if the facts remain materially the same. The doctrine's purpose is the need for finality of judgments and the lack of jurisdiction of an appellate court to modify its judgments except on rehearing.

In this case, this Court merely dismissed defendants' earlier claim of appeal for lack of jurisdiction. This Court made no ruling regarding the merit of defendants' counterclaim or third-party complaint and did not prohibit the trial court from considering a properly presented and supported motion for summary disposition of those claims. This Court made clear that, for it to have jurisdiction over any appeal in this case, a final order had to be entered, and since one had not, this

Court could not exercise appellate jurisdiction.  Defendants' argument in this regard, therefore, fails as a matter of law.

The trial court properly granted the DDA's motion for summary disposition of defendants' counterclaim and third-party complaint.  Defendants failed to state a cognizable cause of action against plaintiffs because their allegations in their counterclaim were in actuality merely denials of plaintiffs' allegations of breaches of the Lease.  The trial court's correct decisions that Lotus breached the Lease and that Gwendolyn and Bridgewater breached their personal guaranties conclusively determined the invalidity of the allegations in defendants' counterclaim that the Lease had not been breached.  Defendants also failed to state a valid third-party complaint against Judge Colombo because he had absolute judicial immunity and Judge Colombo did not violate defendants' rights to due process by carrying out his duties as chief judge to determine the assignment of cases in the circuit court in which he presided.

Defendants next contend that the State Court Administrative Office could not assign to Judge Burton the de novo review of their motion to disqualify Judge Colombo because Judge Burton lacked subject-matter jurisdiction and authority to adjudicate matters and enter orders in a pending action in circuit court.  We disagree.

We review de novo whether a court has subject-matter jurisdiction, which is a question of law.  *In re Wayne Co Treasurer*, 265 Mich App 285, 290; 698 NW2d 879 (2005), lv den 474 Mich 862 (2005), recon den 474 Mich 1022 (2006).  We review de novo the proper interpretation of statutes and court rules as questions of law.  *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

A court's subject-matter jurisdiction is an "absolute requirement" for a valid judicial proceeding.  *In re AMB*, 248 Mich App 144, 166; 640 NW2d 262 (2001).  The existence of subject-matter jurisdiction is a question of law.  *W A Foote Mem Hosp v Dep't of Pub Health*, 210 Mich App 516, 522; 534 NW2d 206 (1995).  In *Usitalo v Landon*, 299 Mich App 222, 228; 829 NW2d 359 (2012) (quotation marks and citations omitted), this Court explained:

> Subject-matter jurisdiction refers to a court's power to act and authority to hear and determine a case.  Subject-matter jurisdiction describes the types of cases and claims that a court has authority to address.  This Court explained:
>
> > Jurisdiction over the subject matter is the right of the court to exercise judicial power over that class of cases; not the particular case before it, but rather the abstract power to try a case of the kind or character of the one pending; and not whether the particular case is one that presents a cause of action, or under the particular facts is triable before the court in which it is pending, because of some inherent facts which exist and may be developed during the trial.

Michigan's Constitution provides that our Supreme Court shall have superintending control over all courts.  Const 1963, art 6, § 4.  The Constitution requires our Supreme Court to establish rules for practice and procedure in all courts of this state.  Const 1963, art 6, § 5.  Under Const 1963, art 6, § 3, our Supreme Court "shall appoint an administrator of the courts and other

assistants of the supreme court as may be necessary to aid in the administration of the courts of this state[ and the] administrator shall perform administrative duties assigned by the court." Our Supreme Court has administrative oversight of Michigan's courts and exercises that oversight through the State Court Administrative Office.

In MCL 600.826(1), the Legislature authorized our Supreme Court and the State Court Administrative Office to direct elected probate judges to assist other courts and perform specific assignments. MCL 600.826(1) provides in relevant part:

> A probate judge who is elected or appointed for a county . . . and whose judicial activity is less heavy than other probate judges should be authorized by the supreme court or state court administrator to assist other courts within the same county or probate court district which they serve, to assist probate judges in other counties or districts, and to perform other judicial duties, for limited periods or specific assignments.

Under its constitutionally vested authority, our Supreme Court adopted MCR 8.103 which in relevant part provides:

> The state court administrator, under the Supreme Court's supervision and direction, shall:

> (4) recommend to the Supreme Court the assignment of judges where courts are in need of assistance and carry out the direction of the Supreme Court as to the assignment of judges;

> * * *

> (10) attend to other matters assigned by the Supreme Court.

Our Supreme Court also adopted MCR 2.003 governing the disqualification of a judge, which provides:

> (A)  This rule applies to all judges, including justices of the Michigan Supreme Court, unless a specific provision is stated to apply only to judges of a certain court. The word "judge" includes a justice of the Michigan Supreme Court.

> (B)  A party may raise the issue of a judge's disqualification by motion or the judge may raise it.

> (C)  Grounds

> (1)  Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:

> (a)  The judge is biased or prejudiced for or against a party or attorney.

-19-

(b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556 US 868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

(c) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding.

(d) The judge has been consulted or employed as an attorney in the matter in controversy.

(e) The judge was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(f) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has more than a de minimis economic interest in the subject matter in controversy that could be substantially impacted by the proceeding.

(g) The judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

\* \* \*

(D) Procedure.

(1)(a) Time for Filing in the Trial Courts. To avoid delaying trial and inconveniencing the witnesses, all motions for disqualification must be filed within 14 days of the discovery of the grounds for disqualification. If the discovery is made within 14 days of the trial date, the motion must be made forthwith.

\* \* \*

(2) All Grounds to be Included; Affidavit. In any motion under this rule, the moving party must include all grounds for disqualification that are known at the time the motion is filed. An affidavit must accompany the motion.

(3) Ruling.

(a)  For courts other than the Supreme Court, the challenged judge shall decide the motion.  If the challenged judge denies the motion,

\* \* \*

(ii)  in a single-judge court, or if the challenged judge is the chief judge, on the request of a party, the challenged judge shall refer the motion to the state court administrator for assignment to another judge, who shall decide the motion de novo.

Analysis of the Constitutional provisions and MCL 600.826, reveals that our Supreme Court had authority to establish the State Court Administrative Office and vest it with authority to assign to a probate judge the task of reviewing Judge Colombo's denial of defendants' judicial disqualification motion and to decide the motion de novo.  The record reflects that the State Court Administrative Office properly carried out its duties in this regard.  Judge Burton, therefore, had subject-matter jurisdiction, as a judge assigned by the State Court Administrative Office pursuant to our Supreme Court's court rules and so authorized to decide defendants' judicial disqualification motion de novo.  The State Court Administrative Office had authority under MCL 600.826 to assign Judge Burton to assist the circuit court with determining defendants' judicial disqualification motion.  In so doing, Judge Burton did not violate Const 1963, art 6, § 15, as contended by defendants and Paterson, because Judge Burton exercised the jurisdiction of the circuit court in his specific limited assignment as authorized by law.  Accordingly, defendants' challenge to Judge Burton's jurisdiction fails as a matter of law.  Judge Burton, therefore, properly denied defendants' and Paterson's motion to disqualify Judge Colombo and also properly denied defendants' and Paterson's motion to disqualify Judge Burton.

The State Court Administrative Office had authority to assign the review of Judge Colombo's denial of defendants' motion to disqualify Judge Colombo and to determine that motion de novo because Michigan's Constitution authorized our Supreme Court to establish rules for practice and procedure in all courts of the state, appoint an administrator of the courts to perform administrative duties assigned by the Supreme Court, and the Legislature authorized our Supreme Court and the State Court Administrative Office in MCL 600.826(1) to direct elected probate judges to assist other courts and perform specific assignments.  Judge Burton appropriately assisted the circuit court and had subject-matter jurisdiction to determine de novo defendants' motion to disqualify Judge Colombo as provided by MCR 2.003, and to rule on any other matters arising from Judge Burton's service in this regard.

Defendants and Paterson argue that their motion to disqualify Judge Colombo had merit and was not frivolous because they believed that the judge favored Detroit because of his political ties to Detroit's mayor and that he disfavored Paterson and his clients.  They assert that the trial court erred by sanctioning them for filing a frivolous motion.  We disagree.

We review for clear error a trial court's finding that an action is frivolous.  *Kitchen v Kitchen*, 465 Mich 654, 661; 641 NW2d 245 (2002); see also *Home-Owners Ins Co v Andriacchi*, 320 Mich App 52, 75; 903 NW2d 197 (2017).  A decision is clearly erroneous where, although

there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Kitchen*, 465 Mich at 661-662; *Andriacchi*, 320 Mich App at 75-76.

"Sanctions are mandatory if a court determines that a document was signed in violation of MCR 2.114." *Home-Owners Ins Co v Andriacchi*, 320 Mich App 52, 76; 903 NW2d 197 (2017). In *Andriacchi*, this Court considered whether the trial court erred by not sanctioning the defendant after finding his motion to disqualify the trial judge frivolous. This Court explained how sanctions may be issued under MCR 2.114 as follows:

> Whenever an attorney or party signs a motion, that person's signature constitutes "certification" that he or she has "read the document" and, "to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law," and that the motion was not made for "any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." MCR 2.114(D). If a party brings a motion that has been signed in violation of MCR 2.114(D), the trial court must "impose upon the person who signed it, a represented party, or both, an appropriate sanction . . . ." MCR 2.114(E). The trial court may not assess punitive damages, but may order the person who signed it or a represented party to pay "the other party or parties the amount of the reasonable expenses incurred because of the filing . . . ." MCR 2.114(E). [*Andriacchi*, 320 Mich App at 78 (citation omitted).]

Whether the trial court correctly concluded that defendants' and Paterson's motion to disqualify Judge Colombo was frivolous requires analysis of the grounds for disqualification of a presiding judge. A party that challenges a judge for bias must overcome a heavy presumption of judicial impartiality. *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999). Under MCR 2.003(C)(1)(a), disqualification of a judge is warranted when the judge is biased or prejudiced for or against a party or attorney. In general, a party must show actual, personal prejudice to disqualify a judge under MCR 2.003. *People v Wade*, 283 Mich App 462, 470; 771 NW2d 447 (2009). The bias must be personal and extrajudicial, having its origin in events or sources gleaned outside the judicial proceedings. *Cain v Dept of Corrections*, 451 Mich 470, 495; 548 NW2d 210 (1996). "[J]udicial rulings, in and of themselves, almost never constitute a valid basis for motion alleging bias, unless the judicial opinion displays a deep-seated favoritism or antagonism that would make fair judgment impossible." *Armstrong v Ypsilanti Charter Twp*, 248 Mich App 573, 597; 640 NW2d 321 (2001) (internal quotation marks omitted), quoting *Cain*, 451 Mich at 496. Similarly, opinions formed by a judge during the course of the trial based on facts introduced or events that occur during the proceedings do not constitute bias "unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Wells*, 238 Mich App at 391. Even comments critical of or hostile to counsel or the parties are ordinarily not supportive of finding bias or partiality. *Id*. Further, expressions of impatience and annoyance do not establish bias. *Cain*, 451 Mich at 497 n 30, quoting *Liteky v US*, 510 US 540, 555-556; 114 S Ct 1147; 127 L Ed 2d 474 (1994).

A trial judge is presumed to be impartial. *In re MKK*, 286 Mich App 546, 566-67; 781 NW2d 132 (2009). Disqualification on the basis of bias or prejudice, however, cannot be established merely by repeated rulings against a litigant, even if the rulings are erroneous. *In re*

*Contempt of Henry*, 282 Mich App, 656, 680; 765 NW2d 44 (2009). Further, a trial judge's remarks made during trial, which are critical of or hostile to counsel, the parties, or their cases, ordinarily do not establish disqualifying bias. *Schellenberg v Rochester Elks*, 228 Mich App 20, 39; 577 NW2d 163 (1998). The test is not just whether or not actual bias exists but also whether such a likelihood of bias or an appearance of bias existed that the judge would be unable to hold the balance between vindicating the interests of the court and the interests of the affected party. *People v Lowenstein*, 118 Mich App 475, 482; 325 NW2d 462 (1982), quoting *Ungar v Sarafite*, 376 US 575, 588; 84 S Ct 841; 11 L Ed 2d 921 (1964); *Ireland v Smith*, 214 Mich App, 235, 250; 542 NW2d 344, 351 (1995) affd as modified, 451 Mich 457; 547 NW2d 686 (1996).

In this case, at the hearing on defendants' and Paterson's motion to disqualify Judge Colombo, the judge considered each allegation made by them and demonstrated how the allegations were false. Judge Colombo recited the applicable law that judicial rulings cannot be the ground for disqualification and almost never constituted a valid basis for a motion alleging bias unless the evidence established actual favoritism or antagonism that made the judge's ability to fairly judge the matter impossible. Judge Colombo found that his previous rulings in cases involving Paterson's clients did not demonstrate favoritism or antagonism or even intimate such. Judge Colombo also recounted that Detroit suffered numerous losses in cases over which he had presided.

Judge Colombo also considered defendants' and Paterson's contention that Detroit's mayor played a role in getting Judge Colombo to become the chief judge of the circuit court. Judge Colombo explained that Detroit's mayor had nothing to do with his appointment to the chief judge position. Judge Colombo described how he had been approached by two Supreme Court justices on the subject at a Detroit Bar Association meeting, declined initially, but at a later date accepted the appointment made by our Supreme Court. Respecting defendants' and Paterson's contention that Judge Colombo and his wife contributed to Detroit's mayor's campaign, Judge Colombo affirmed that he had done so but explained in detail how that did not serve as a ground for disqualification of a judge. Judge Colombo also denied that he had close political ties to Detroit's mayor because he had never socialized with him or had social contact with him. Judge Colombo found that defendants and Paterson could not establish their allegations or show that his decision making in this case would be affected by any of the things defendants and Paterson alleged.

Judge Colombo also clarified that he first learned of Paterson's and his client's public criticism of Judge Colombo in Paterson's brief in this case and concluded that such did not serve as a valid ground for his disqualification. Judge Colombo also clarified that the local administrative order that assigned this case to him as the chief judge had been vetted and approved by the State Court Administrative Office and could not serve as a ground for judicial disqualification.

The record reflects that Judge Colombo rebutted each and every allegation relied upon by defendants and Paterson. None of their allegations were or could be substantiated. Judge Colombo's factual findings were supported by publicly available evidence and were not clearly erroneous. The record reflects that defendants and Paterson made false accusations to disqualify Judge Colombo. Consequently, defendants and Paterson could neither prove actual personal bias or prejudice originating outside the judicial proceedings nor that Judge Colombo harbored a deep-

seated favoritism or antagonism that would make it impossible for Judge Colombo to fairly judge matters in this case.

The record reflects that defendants and Paterson failed to make reasonable inquiry before filing their motion to disqualify Judge Colombo and that their motion lacked any basis in fact or law. The record also indicates that defendants and Paterson filed the motion to disqualify Judge Colombo for an improper purpose to unnecessarily delay the proceedings and in an effort to get the case reassigned to a judge whom they deemed more favorable to them. Judge Colombo, therefore, properly denied defendants' and Paterson's motion to disqualify.

At the hearing on plaintiffs' motion for sanctions for violating MCR 2.114, the trial court reiterated the grounds on which it had denied defendants' and Paterson's motion to disqualify Judge Colombo and repeated that their allegations were blatantly false. The trial court relied on *Grievance Administrator v Fieger*, 476 Mich 231, 274-275; 719 NW2d 123 (2006), for the proposition that attorneys should not sue judges and also use their filing of a suit against the judge as a basis for disqualification. The trial court observed that, when their motion to disqualify him got assigned by the State Court Administrative Office to Judge Burton, they moved to disqualify Judge Burton delaying the proceedings in this case further which never should have happened.

The trial court properly ruled that MCR 2.114(a) specified that it applied to filed motions and other papers, and MCR 2.114(d)(3) required the signing attorney or party to certify by signing that the document had not been interposed for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the costs of litigation. The trial court also correctly stated that MCR 2.114(e) provided for imposing sanctions for a violation of the court rule which could include requiring the payment of the other party or parties' reasonable attorney fees and expenses. The trial court found that defendants improperly filed their unsupported motion to delay the proceedings and to harass and increase the cost of the litigation in this case. The trial court's findings in this regard were not clearly erroneous.

The record reflects that the trial court properly denied defendants' and Paterson's motion to disqualify Judge Colombo and later correctly found that their filing of that motion violated MCR 2.114 because it blatantly lacked any legitimate ground. The record also supports the trial court's determination that defendants and Paterson interposed their disqualification motion for an improper purpose. The record indicates that after plaintiffs moved for a preliminary injunction and noticed the motion for hearing, defendants and Paterson moved to disqualify Judge Colombo. After he denied their motion on the ground that it lacked validity and the State Court Administrative Office assigned the motion to disqualify Judge Colombo to Judge Burton for de novo review and decision, they filed another frivolous motion to disqualify Judge Burton which further delayed the proceedings. Judge Burton properly denied defendants' and Paterson's motion to disqualify Judge Colombo because the motion lacked merit. Analysis of this record indicates that defendants and Paterson filed their motion to disqualify Judge Colombo for two unjustifiable reasons, to delay the trial court's determination of plaintiffs' motion for preliminary injunction and in an attempt to get the case reassigned to another circuit judge. The record in this case supports the trial court's decision that defendants and Paterson violated MCR 2.114 by filing a frivolous motion to disqualify Judge Colombo, and the trial court properly sanctioned them for doing so. Accordingly, the trial court did not err.

Defendants lastly argue that the attorneys' fees the trial court assessed against defendants and Paterson were excessive and unreasonable because defendants' and Paterson's motions for disqualification of Judge Colombo and Judge Burton did not require plaintiffs' counsel to expend much time, the facts and the law were clear, and the hearings for each motion did not last more than 30 minutes. We disagree.

We review for an abuse of discretion a trial court's determination of the amount of sanctions imposed. *Vittiglio v Vittiglio*, 297 Mich App 391, 408; 824 NW2d 591 (2012). An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes. *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008).

Defendants and Paterson state without any substantive analysis or citation to the record that the trial court assessed excessive and unreasonable attorneys' fees. "When an appellant fails to address the basis of a trial court's decision, this Court need not even consider granting relief." *Seifeddine v Jaber*, 327 Mich App 514, 522; 934 NW2d 64 (2019) (citation omitted). Defendants' and Paterson's position on this issue fails for that reason alone. This Court has further explained that, "where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court." *Yee v Shiawassee Co Bd of Commrs*, 251 Mich App 379, 406; 651 NW2d 756 (2002) (citation omitted). Because defendants and Paterson failed to cite authority and explain the rationale for this claimed error, this Court may find that they abandoned this claim of error and decline to address it.

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow. [*Id.* (citation omitted).]

Under *Seifeddine and Yee*, we hold that defendants and Paterson abandoned this claim of error and, therefore, we decline to review it.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Colleen A. O'Brien
/s/ James Robert Redford

-25-